MANDRACCHIA LAW, LLC
Charles D. Mandracchia, Esquire
Pennsylvania Attorney ID No. 52844
Jeffrey Soderberg
Pennsylvania Attorney ID No. 55369
2024 Cressman Road
P.O. Box 1229
Skippack, PA 19474-1229                        Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## CIVIL ACTION - LAW

| | |
|---|---|
| CABLE LINE, INC.<br>311 N. 7th Street<br>Perkasie, PA 18942,<br>    and | : <br>:<br>:<br>: |
| | :JURY TRIAL DEMANDED |
| McLAUGHLIN<br>COMMUNICATIONS,<br>INC.<br>932 Springbrook Avenue<br>Moosic, PA 18507 | :<br>:<br>:<br>: |
| | : *3:16-CV-1000* |
| | : |
|     Plaintiffs<br>    v. | :<br>:   No. |
| | : |
| COMCAST CABLE COMMUNICATIONS<br>OF PENNSYLVANIA, INC.,<br>1500 Market Street<br>Philadelphia, PA 19103-2838 | :<br>:<br>:<br>: |
| DECISIVE COMMUNICATIONS<br>9416 Dr. Perry Road<br>Ijamsville, Maryland 21754 | :<br>:<br>:<br>: |
| VITEL COMMUNICATIONS,<br>A SUBSIDIARY OF JNET<br>COMMUNICATIONS, LLC<br>25 Independence Boulevard<br>Warren, New Jersey 07059<br>    Defendants. | :<br>:<br>:<br>:<br>:<br>: |

**FILED**
**SCRANTON**

MAY 2 6 2016

Per_____
DEPUTY CLERK

## COMPLAINT

Plaintiffs Cable Line, Inc. and McLaughlin Communications, Inc., by and through their undersigned attorneys, bring this action against Defendants Comcast Cable, Decisive Communications, and Vitel Communications, a subsidiary of JNET Communications, and in support thereof Plaintiffs aver as follows:

## PARTIES

1.  Plaintiff Cable Line Inc. ("Cable Line") is a domestic corporation duly formed and existing under and pursuant to the laws of the Commonwealth of Pennsylvania with a registered office located at 311 North 7th Street, Perkasie, Bucks County, Pennsylvania.

2.  Plaintiff McLaughlin Communications Inc. ("McLaughlin") is a domestic corporation duly formed and existing under and pursuant to the laws of the Commonwealth of Pennsylvania with a registered office located at 932 Springbrook Avenue, Moosic, Lackawanna County, Pennsylvania.

3.  Defendant, Comcast Cable Communications of Pennsylvania, Inc., ("Comcast") is upon information and belief, a domestic corporation duly formed and existing under and pursuant to the laws of the Commonwealth of Pennsylvania with a registered office address at 1500 Market Street, Philadelphia, Pennsylvania.

4.   Defendant Vitel Communications ("Vitel") is, upon information and belief, a division of JNET Communications, a domestic corporation duly formed and existing under and pursuant to the laws of the state of New Jersey, with an office address at 25 Independence Blvd., Ste. 103, Warren, New Jersey.

5.   Defendant Decisive Communications ("Decisive") is, upon information and belief, a domestic corporation duly formed and existing under and pursuant to the laws of the state of Maryland, with an office address at 9416 Doctor Perry Road, Ijamsville, Maryland.

## JURISDICTION

6.   This Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1331, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section 15 of the Clayton Antitrust Act, 15 U.S.C. § 15, and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

7.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

8.   Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Lackawanna, Adams, Centre, Dauphin, Franklin, and York Counties, Pennsylvania.

## FACTS

9. All of the averments contained in the paragraphs above are incorporated herein by reference as if fully set forth at length.

10. Defendant Comcast Cable is the largest cable television company in the world by revenue and the nation's largest internet service provider.

11. Unsurprisingly, the delivery of cable television and Internet services requires the installation of actual cables in the homes and businesses of consumers.

12. As is typical in its industry, Comcast has subcontracted over the years with cable installation companies—including Plaintiffs Cable Line and McLaughlin, as well as Defendants Decisive and Vitel—to install the cable and hardware that permit individual consumers to access Comcast's products.

13. Both Plaintiffs and Defendants Vitel and Decisive competed successfully in a 2010 RFP process initiated by Comcast to select cable installation subcontractors in various regions.

14. At all times relevant to this Complaint, Plaintiff Cable Line installed cable for Comcast customers in sections of Pennsylvania and Maryland.

15. At all times relevant to this Complaint, Plaintiff McLaughlin Communications installed cable for Comcast customers in sections of Pennsylvania, Maryland, West Virginia and Virginia.

16. Within Pennsylvania, Plaintiffs worked in numerous counties on behalf of Comcast, including Lackawanna, Adams, Centre, Dauphin, Franklin, and York.

17. Comcast advised 2010 RFP winners to "ramp up" operations in select regions to support the volume of installation work required.

18. In response, Plaintiff Cable Line invested in new warehouse facilities in Central Pennsylvania, purchased twenty new vehicles, and trained new technicians at significant expense.

19. Plaintiff McLaughlin established offices in six communities and opened a dispatch center to process calls from Comcast customers.

20. Unbeknownst to Plaintiffs, at the same time that Comcast issued its 2010 RFP, selected them to be subcontractors, and told them to "ramp up," Comcast had launched a national subcontractor reduction plan from its Philadelphia corporate headquarters.

21. The national subcontractor reduction plan called for a reduction in the number of regional cable installation firms working with Comcast from 176 in 2009 to 39 in 2012.

22. Comcast had no intention of working with Plaintiffs for the long haul; instead, it planned to allocate the market for cable installation to a handful of chosen subcontractors.

23. As the largest cable and Internet provider in the country, Comcast could effectively dictate which installation firms survived past 2012.

24. Between February 28, 2012 and May 27, 2012, Comcast agreed with Defendants Vitel and Decisive to allocate regional cable installation markets in portions of Pennsylvania, Maryland, Virginia, and West Virginia, in the process driving competitors such as Plaintiffs out of the market.

25. In February 2012, Comcast notified Plaintiffs by letter that their long-term relationships, ratified just two years earlier during the RFP process, would be terminated on May 27, 2012.

26. Defendants' conspiracy resulted in direct damage to Plaintiffs, who had been induced to invest millions of dollars in human and physical capital that would be absorbed for pennies on the dollar by Defendants Decisive and Vitel.

27. Defendants' conspiracy resulted in damage to the market for cable installation in general.  For example, the conspiracy led to:

    a.  consolidation of the market for cable installation;

    b.  reduction in the number of firms competing to provide quality service to consumers;

    c.  flattening wage rates and employment choices for individual installers;

    d.  making over-worked "independent contractors" the industry standard in a labor force that once rewarded skilled workers.

28. Comcast's decision to reduce the total number of cable installation firms working with it from 176 to 39 effectively killed off a substantial portion of the cable installation industry engaged in interstate commerce.

29. Comcast's tactic of inducing installation firms to invest heavily in specific regions and then firing them in favor of its conspirators also led to the quick realignment of human capital and resources in the cable installation industry.

30. On information and belief, Comcast planned to have smaller, local companies bear the brunt of expenses building infrastructure for cable and Internet services in their home communities.

31. On information and belief, once the local markets were established, Comcast planned to replace smaller installation companies with larger companies that offered less compensation to installers and thus passed on lower costs to Comcast.

32. Comcast abruptly reduced its subcontracting force after encouraging small companies like Plaintiffs to ramp up operations.

33. Small companies like Plaintiffs were thus forced to lay off skilled workers and liquidate equipment at highly discounted rates.

34. Comcast and its co-defendants benefitted from the fire sale of cable installation assets that Comcast had forced.

35. For example, Defendant Vitel purchased McLaughlin's fleet of trucks for ten cents on the dollar.

36. By way of further example, Comcast actually informed Defendants Vitel and Decisive that Plaintiffs had been terminated before it informed Plaintiffs, in order to give its co-conspirators a chance to recruit trained technicians.

37. Decisive and Vitel began to recruit Plaintiffs' employees just before Plaintiffs received their termination letters.

38. The quick consolidation of resources created another barrier to entry in an already tight market in which cable installers competed to work with a shrinking number of cable companies and Internet service providers.

39. The consolidation of the cable installation industry produced no positive effects for consumers, as firms were selected on irrational criteria.

40. Comcast has never even bothered to claim that the consolidation of the cable installation industry would lower costs for consumers.

41. Comcast did ostensibly develop a system of metrics to measure the quality of subcontracting installers' work.

42. Metrics purported to measure installers' craftsmanship and the number of service calls generated when subcontractors failed to install cable correctly.

43. Service calls—or "truck rolls"—are a quantifiable, accurate measure of the customer service experience in the cable industry.

44. In addition, each truck roll costs between $100 and $600, representing a significant expense for Comcast, which paid for millions of service calls annually.

45. Upon information and belief, the cost of "truck rolls" are passed on to cable consumers through higher fees.

46. Comcast developed a proprietary customer database, Cable Data, to track its subcontractor metrics.

47. Comcast would tally metrics data and identify the highest and lowest scoring subcontractors.

48. Subcontractors who scored at the low end of the scale relative to other companies were penalized by being required to pay millions of dollars' worth of chargeback fees to Comcast.

49. The metrics system and Comcast's tracking of it was easily corrupted.

50. Larger companies, such as Defendant Decisive, could view and change the information stored in Cable Data.

51. Decisive did exactly that, simply erasing evidence of a significant number of service calls.

52. Smaller companies, such as the Plaintiffs in this action, could view data but not change it.

53. Larger companies, such as Decisive and Vitel, could pay to communicate with customers directly about service issues and encourage customers to call them instead of Comcast.

54. For example, Defendants Decisive and Vitel affixed stickers to paperwork given to customers directing them to call installers directly to report service issues.

55. By encouraging customers to call them directly, installation subcontractors could inflate their performance in the Comcast metrics system.

56. The end result of the corruption of Comcast's metrics measurement system was that the metrics were wholly inaccurate measures of customer service quality.

57. In addition, smaller companies, such as Plaintiffs, paid millions of dollars in chargeback penalties to Comcast based on faulty results.

58. Although Defendants Vitel and Decisive gained a competitive advantage by failing to report truck rolls, they absorbed immediate expenses.

59. By not reporting truck rolls, Vitel and Decisive spared Comcast the expense of reimbursing them for truck rolls.

60. Defendant Comcast knew that companies like Decisive had access to its database and was actively inflating the quality of their metrics.

61. Defendant Comcast knew that companies like Decisive and Vitel actively subverted the metrics system by communicating directly with consumers via unauthorized flyers and stickers.

62. Representatives from Plaintiff Cable Line had met with Comcast staff members to discuss their concerns about the manipulation of metrics.

63. Comcast launched an internal investigation, concluding that its own regional executives were aware of the corruption of the metrics.

64. Comcast benefitted from the corruption because it gave investors the impression of improved service quality.

65. Comcast benefitted from the corruption because it did not have to reimburse co-conspirators Decisive and Vitel for service calls.

66. Comcast also developed a spasmodic system of tracking equipment for subcontractors.

67. Plaintiffs were charged hundreds of thousands of dollars to compensate Comcast for equipment that had purportedly gone missing, but in fact had been sent out for repair and was working properly in customers' homes.

68. At the same time, employees of Defendant Vitel had—on three separate occasions investigated by Comcast—misappropriated and resold thousands of dollars of Comcast equipment.

69. Perhaps unsurprisingly, when Comcast made a preliminary determination as to which firms would be eliminated through its national subcontractor reduction plan on February 28, 2012, Decisive and Vitel were among the companies slated for termination.

70. Upon information and belief, executives in Comcast's corporate office in Philadelphia intervened to keep Decisive and Vitel within the Comcast family and profiting without producing good results.

71. Between February 28, 2012, when Decisive and Vitel were to receive the news that they had been terminated, and May 27, 2012, when terminations were formalized, Defendant Comcast entered conspiracies with Decisive and Vitel to allocate the market for cable installations in Pennsylvania, Maryland, Virginia and West Virginia.

72. Each Defendant acted outside of its economic interest to make the conspiracies possible:

a. Decisive and Vitel had to absorb immediate losses in order to cover up truck rolls.

b. Decisive and Vitel—knowing that they had barely made the cut in the national contractor reduction plan—were motivated to absorb those losses in order to be allocated a larger share of the market.

c. Contrary to its own economic interests, Comcast chose to reward firms that had literally stolen and trafficked equipment and had subverted the performance metrics systems for its own gain.

d. Comcast chose to work with Decisive and Vitel to drive competent smaller businesses such as Plaintiffs out of markets, driving down labor costs.

e. In addition, Comcast preferred to work with firms that would buy into its system of suppressing "truck roll" data.

f. Doctored truck roll data enhanced the myth that Comcast made strides in its approach to customer service, pleasing the public.

g. Doctored truck roll data also lowered Comcast's bottom line, pleasing shareholders.

73. Comcast had an extra motive for working with Vitel, despite Vitel's spotty record: unlike Plaintiffs, it was "Comcast classified diverse."

74. As it acquired NBC Universal in 2011, Comcast faced increasing scrutiny from regulators and consumer advocates concerned about Comcast's ability to develop and deliver television content relevant to a diverse society.

75. To acquire NBC Universal, Comcast signed a Memorandum of Understanding with the Federal Communications Commission promising to support the development of ten minority-owned cable channels by 2019.

76. Comcast's lack of commitment to the work of minority artists and entrepreneurs is still the subject of pending federal lawsuits.

77. With more mergers and scrutiny on the horizon in 2011, Comcast sought to bolster its paltry efforts at increasing diversity in the cable industry.

78. Struggling at developing work by minority artists, Comcast turned its focus to boosting minority participation in other segments of the cable business.

79. One goal of the national contractor reduction plan was to increase the percentage—but not the number—of minority-owned subcontractors with which Comcast worked.

80. In fact, Comcast's plan was to reduce the number of fulfillment contractors that it used nationally from 176 in 2009 to 39 in 2012.

81. Among that number would be 10 contractors considered "Comcast classified diverse."

82. Comcast had an internal tracking system for deciding which subcontractors were "diverse."

83. Vitel was tracked as diverse; Plaintiffs were not.

84. Ironically, in 2009, Comcast worked with 23 diverse fulfillment contractors.

85. Thus, while the <u>percentage</u> of diverse installation firms with Comcast contracts would increase exponentially (from 13% to 26%) between 2009 and 2012, the <u>number</u> of minority entrepreneurs actually working with Comcast would decline sharply.

86. By bringing the total number of installation subcontractors down to approximately 39 and making 10 of those firms minority-owned, Comcast could give the impression that it was devoted to diversity without actually producing memorable television programming or increasing contact with minority entrepreneurs.

87. Plaintiff companies performed as well, or better, as Defendant Vitel at installing cable.

88. Unlike Vitel, Plaintiff companies had not been routinely investigated for misappropriating Comcast property.

89. On information and belief, Vitel was removed from the list of terminated cable installation subcontractors by Comcast corporate because of its status as a "Comcast classified diverse" company.

90. By choosing to contract with Defendant Vitel rather than Plaintiffs in service to illusory diversity goals, Comcast discriminated against Plaintiffs on the basis of race.

## COUNT 1
## SHERMAN ACT, 15 U.S.C. § 1—CONSPIRACY IN RESTRAINT OF TRADE
## PLAINTIFFS v. DEFENDANTS

91. All the averments contained in the paragraphs above are incorporated herein by reference as if fully set forth at length.

92. Defendants have conspired to create an unreasonable restraint of trade.

93. Defendant Comcast, which led the conspiracy, has substantial market power as the largest cable company and Internet Service Provider in the United States.

94. Defendant Comcast made separate but similar agreements with Decisive and Vitel to allocate the market for cable installation in Pennsylvania, Maryland, Virginia, and West Virginia, driving firms such as Plaintiffs out of business.

95. Defendants' actions have drastically shrunk the market for cable installers.

96. Defendants' actions have lowered wages in the cable installation industry.

97. Defendants' actions have created a barrier to entry for cable installation companies.

98. Defendants' actions have provided no benefit to consumers in terms of price or quality of service.

99. In fact, Defendants intentionally distorted the metrics that measure customer service quality.

100. Defendants' actions decreased consumers' choices in the cable installation market.

101. Defendants' actions increased Comcast's control of the cable industry in each region.

102. Forced to liquidate their assets and close in each region, Plaintiffs have been injured by Defendants' illegal activities.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants in an amount in excess of $150,000.00 for actual damages, treble damages as authorized under the Clayton Anti-Trust Act, and an award of

reasonable costs, attorneys' fees, and such further relief as the Court may deem just and equitable, as shown by the evidence.

## COUNT II
## MARYLAND ANTI-TRUST ACT (MD. CODE ANN., COM. LAW § 11-204(a)(1))—CONSPIRACY IN RESTRAINT OF TRADE: PLAINTIFFS VS. DEFENDANTS

103.      All the averments contained in the paragraphs above are incorporated herein by reference as if fully set forth at length.

104.      Defendants have conspired to create an unreasonable restraint of trade.

105.      Defendant Comcast, which led the conspiracy, has substantial market power as the largest cable company and Internet Service Provider by revenue in the United States.

106.      Defendant Comcast made separate but similar agreements with Decisive and Vitel to allocate the market for cable installation in Maryland, driving firms such as Plaintiffs out of business.

107.      Defendants' actions have drastically shrunk the market for cable installers.

108.      Defendants' actions have lowered wages in the cable installation industry.

109.      Defendants' actions have created a barrier to entry for cable installation companies.

110.      Defendants' actions have provided no benefit to consumers in terms of price or quality of service.

111.      In fact, Defendants intentionally distorted the metrics that measure customer service quality.

112.      Defendants' actions decreased consumers' choices in the cable installation market.

113.      Defendants' actions increased Comcast's control of the cable industry in Maryland.

114.      Forced to liquidate their assets and close in Maryland, Plaintiffs have been injured by Defendants' illegal activities.

**WHEREFORE,** Plaintiffs demand judgment in their favor and against Defendants in an amount in excess of $150,000.00 for actual damages, treble damages, and an award of reasonable costs, attorneys' fees, and such further relief as the Court may deem just and equitable, as shown by the evidence.

**COUNT III**
**VIRGINIA ANTI-TRUST ACT, VA. CODE § 59.1-9.1, et seq.—**
**CONSPIRACY IN RESTRAINT OF TRADE**
**PLAINTIFF MCLAUGHLIN VS. DEFENDANTS**

115.      All the averments contained in the paragraphs above are incorporated herein by reference as if fully set forth at length.

116.      Defendants have conspired to create an unreasonable restraint of trade.

117.     Defendant Comcast, which led the conspiracy, has substantial market power as the largest cable company and Internet Service Provider in the United States.

118.     Defendant Comcast made separate but similar agreements with Decisive and Vitel to allocate the market for cable installation in Virginia, driving firms such as Plaintiff McLaughlin out of business.

119.     Defendants' actions have drastically shrunk the market for cable installers.

120.     Defendants' actions have lowered wages in the cable installation industry.

121.     Defendants' actions have created a barrier to entry for cable installation companies.

122.     Defendants' actions have provided no benefit to consumers in terms of price or quality of service.

123.     In fact, Defendants intentionally distorted the metrics that measure customer service quality.

124.     Defendants' actions decreased consumers' choices in the cable installation market in Virginia.

125.     Defendants' actions increased Comcast's control of the cable industry in Virginia.

126.     Forced to liquidate its assets and close in Virginia, Plaintiff has been injured by Defendants' illegal activities.

**WHEREFORE**, Plaintiff McLaughlin demands judgment in its favor and against Defendants in an amount in excess of $150,000.00 for actual damages, treble damages, and an award of reasonable costs, attorneys' fees, and such further relief as the Court may deem just and equitable, as shown by the evidence.

**COUNT IV**
**WEST VIRGINIA ANTI-TRUST ACT—CONSPIRACY IN RESTRAINT OF TRADE**
**W.V. CODE § 47-8-1, et seq.: PLAINTIFF MCLAUGHLIN VS. DEFENDANTS**

127.     All the averments contained in the paragraphs above are incorporated herein by reference as if fully set forth at length.

128.     Defendants have conspired to create an unreasonable restraint of trade.

129.     Defendant Comcast, which led the conspiracy, has substantial market power as the largest cable company and Internet Service Provider in the United States.

130.     Defendant Comcast made separate but similar agreements with Decisive and Vitel to allocate the market for cable installation in West Virginia, driving firms such as Plaintiff McLaughlin out of business.

131.     Defendants' actions have drastically shrunk the market for cable installers.

132.     Defendants' actions have lowered wages in the cable installation industry.

133.     Defendants' actions have created a barrier to entry for cable installation companies.

134.     Defendants' actions have provided no benefit to consumers in terms of price or quality of service.

135.     In fact, Defendants intentionally distorted the metrics that measure customer service quality.

136.     Defendants' actions decreased consumers' choices in the cable installation market.

137.     Defendants' actions increased Comcast's control of the cable industry in West Virginia.

138.     Forced to liquidate their assets and close in West Virginia, Plaintiff McLaughlin has been injured by Defendants' illegal activities.

**WHEREFORE,** Plaintiff McLaughlin demands judgment in its favor and against Defendants in an amount in excess of $150,000.00 for actual damages, treble damages, and an award of reasonable costs, attorneys' fees, and such further relief as the Court may deem just and equitable, as shown by the evidence.

## COUNT V
## DISCRIMINATION IN THE FORMATION OF CONTRACTS
## 42 U.S.C. § 1981: PLAINTIFFS VS. DEFENDANT COMCAST

139.     Plaintiffs incorporate by reference the preceding paragraphs of the instant Complaint as if set forth in full herein.

140.     When Comcast introduced its national contractor reduction plan, it was under pressure by regulators to display its commitment to diversity.

141.     Comcast assigned a racial identity to its subcontractors, classifying each subcontractor as either "Comcast classified diverse," or not.

142.     Comcast purported to develop and implement an elaborate performance metrics system for measuring the work of installation subcontractors.

143.     However, Comcast knowingly and intentionally allowed the metrics data to be corrupted and rendered meaningless.

144.     Rather than choosing subcontractors based on objectively measured merit, as promised, Comcast chose subcontractors because of their ability to improve Comcast's diversity statistics in filings with the FCC and other agencies.

145.     Comcast intentionally discriminated against firms that were not "classified diverse," including Plaintiffs, on the basis of race.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant Comcast in an amount in excess of $150,000.00, in addition to an award of reasonable costs, attorneys' fees, and such further relief as the Court may deem just and equitable, as shown by the evidence.

RESPECTFULLY SUBMITTED,

/s/ Charles D. Mandracchia, Esquire
Charles D. Mandracchia, Esquire (PA ID # 52844)
cman@mmattorneys.com
Jeffrey Soderberg, Esquire (PA ID # 55369)
jsoderberg@mmattorneys.com
MANDRACCHIA LAW, LLC
P.O. Box 1229
Skippack, PA 19474-1229
610-584-0700
Attorneys for Plaintiffs