THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CABLE LINE, INC. and :
MCLAUGHLIN COMMUNICATIONS :
INC. :
 :
   Plaintiffs, :
  v. : 3:16-CV-1000
 : (JUDGE MARIANI)
COMCAST CABLE COMMUNICATIONS :
OF PENNSYLVANIA, INC., et al., :
 :
   Defendants. :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs are cable installation companies that were former subcontractors of

Comcast Cable Communications of Pennsylvania, Inc. ("Comcast"). They have brought suit

against Comcast and two other cable installation subcontractors for violations of the

Sherman Act and related state antitrust laws, as well as an employment discrimination

claim.

All three defendants moved to dismiss Plaintiff's original complaint on July 29, 2016

and August 1, 2016. Docs. 31, 33, 36. Plaintiffs filed an Amended Complaint on

September 14, 2016 with additional allegations, though the claims remained substantively

the same. Doc. 41. Defendants then moved to dismiss all counts of the Amended

Complaint on October 14, 2016. Docs. 48, 50, 52. For reasons stated below, this Court will

grant Defendants' motions to dismiss the claims without prejudice, but with leave to file a Second Amended Complaint.

## II. FACTUAL ALLEGATIONS

Plaintiffs are cable installation companies incorporated in Pennsylvania. Doc. 41 ¶¶ 1, 2. Comcast is a cable television company and an internet service provider. *Id.* ¶ 10. In order to provide cable and internet services to its customers, Comcast subcontracts with cable installation companies, such as plaintiffs, to install and maintain cable fibers and related devices in customer homes. *Id.* ¶ 11. Plaintiffs, along with co-defendants Decisive Communications ("Decisive") and Vitel Communications ("Vitel"), have all competed for Comcast's business in the past. *Id.* ¶ 15. In 2010, plaintiffs, Vitel, and Decisive were all selected by Comcast to provide cable installation service after a competitive process. *Id.* ¶ 16. In particular, Plaintiffs were awarded contracts with Comcast to provide cable installation services in parts of Pennsylvania, Maryland, Virginia, and West Virginia. *Id.* ¶¶ 16-22. Comcast then advised its selected subcontractors to "ramp up" operations in order to prepare for incoming installation work. *Id.* ¶ 24. Plaintiffs understood that Comcast had solicited cable installation firms to work for at least three years. *Id.* ¶ 34.

However, two years after it hired plaintiffs, Comcast initiated a "national subcontractor reduction plan" that called for a reduction of Comcast's cable installation subcontractors from 176 firms to 39 firms nation-wide. *Id.* ¶¶ 27, 28. Plaintiffs were among the firms that were terminated. *Id.* ¶ 33. They were notified of the decision by letter in

February 2012, though the termination was not "formalized" until May 2012. *Id.* In making

the decision as to which subcontractors which would be terminated, Comcast allegedly

chose to only work with the larger subcontractors such as Decisive and Vitel, who were

purportedly underbilling Comcast by not acknowledging invoices, not billing for service calls,

and falsifying performance metrics. *Id.* ¶¶ 29–31. Specifically, Plaintiffs allege that "larger

companies, such as Defendants Decisive, could view and change the information stored in

[Comcast's internal system]" and that Decisive deleted its number of service calls in the

system, i.e. "truck roll" reports. *Id.* ¶¶ 80–82. Thus, larger companies like Decisive and

Vitel "gained a competitive advantage" by underreporting "truck rolls," absorbing the

immediate expenses, and thereby seeming cheaper to Comcast and giving the impression

of better service quality. *Id.* ¶¶ 92, 93. Decisive and Vitel also allegedly encouraged

Comcast's customers to call them directly about service issues instead of calling Comcast,

therefore making their performance appear better to Comcast. *Id.* ¶¶ 87, 89. Plaintiffs

further allege that Comcast "knew" about these practices by Vitel and Decisive, but did not

do anything about them because it resulted in Comcast not having to reimburse Vitel and

Decisive for service calls. *Id.* ¶ 99. Finally, they allege that when Comcast initiated the

subcontractor reduction plan, it made a "preliminary determination" on February 28, 2012 to

terminate Vitel and Decisive. *Id.* ¶ 104. However, executives at Comcast "intervened to

keep Decisive and Vitel" so that they can "profit[] without producing good results." *Id.* ¶ 105.

Separately, plaintiffs allege that Comcast "had an extra motive for working with Vitel, despite [its] spotty record," because it was classified as "diverse." *Id.* ¶ 108. Comcast has committed to developing more "diverse" cable content and at least ten minority-owned cable channels by 2019. *Id.* ¶ 110. Comcast is allegedly "struggling" with its efforts to develop content by minority artists, and has thus turned its focus on "boosting minority participation in other segments" such as the hiring of its cable installation subcontractors. *Id.* ¶ 113. Plaintiffs allege that one of the reasons Vitel was kept on by Comcast was that it happened to be "tracked as diverse, [while] plaintiffs were not." because they are Caucasian-owned and operated. *Id.* ¶¶ 118, 119.

After their termination, plaintiffs were forced to lay off their workers and liquidate their inventory. *Id.* ¶ 36. Some of plaintiffs' equipment was sold to Decisive and Vitel for "pennies on the dollar," while their former employees were recruited by Decisive and Vitel. *Id.* ¶¶ 36–45. Plaintiffs allege that Comcast "informed Defendants Vitel and Decisive that Plaintiffs had been terminated before it informed Plaintiffs, in order to give [them] a chance to recruit [plaintiffs'] trained technicians," and they did so "just before Plaintiffs received their termination letter." *Id.* ¶¶ 44, 45. Plaintiffs allege that Comcast did so in order to "eliminate smaller companies and competitors to Vitel and Decisive." *Id.* ¶ 48. Between February 28, 2012 to May 27, 2012, Vitel and Decisive were allegedly able to work with Comcast to "consolidat[e] the market for cable installation in specific municipalities in Pennsylvania, West Virginia, Virginia, and Maryland." *Id.* ¶ 52. Plaintiffs allege that as a result of the

4

consolidation, there has been a decrease in quality of cable installation service, *id.* ¶ 52, because smaller companies like plaintiffs were more familiar with rural territories and could service such communities better. *Id.* ¶¶ 64–66. Plaintiffs also allege that the reduction plan "flatten[ed] wage rates and employment choices for individual installers," though it is unclear from the Amended Complaint how that effect came to be. Finally, plaintiffs allege that cable services and equipment costs for consumers had increased "nationally" since their termination. *Id.* ¶¶ 57, 58.

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). "[T]he presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face'…Conclusory assertions of

5

fact and legal conclusions are not entitled to the same presumption." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937).

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 and *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786–87 (citing *Iqbal*, 556 U.S. 679, 129 S.Ct. 1937).

## IV. ANALYSIS

### A. Plaintiffs Have Failed to Adequately Plead Antitrust Standing

Plaintiffs assert an antitrust claim under Section 1 of the Sherman Act. The text of Section 1 of the Sherman Act is broad in scope, prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. However, the Supreme Court has instructed that Section 1 prohibits only "unreasonable" restraints of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.1993). To establish a violation under Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the

relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

Before delving into the elements of Section 1 of the Sherman Act however, plaintiffs must establish that they have "antitrust standing." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). The term "antitrust standing" should not be confused with the constitutional requirement of Article III standing. *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–64 (3d Cir. 2017). In antitrust law, the standing requirement "goes beyond the Constitutional standing requirement of 'injury in fact' and is not satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm to the plaintiff." *Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*, 515 F. Supp. 2d 565, 575 (W.D. Pa. 2007) (internal citations omitted). Instead, causation in an antitrust suit "requires a showing that the defendants' antitrust violation was both a 'but for' cause of the injury, and that it was the proximate cause." *Id.* (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

The Third Circuit has set forth a multifactor test in analyzing antitrust standing:

> "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that

7

> liberal application of standing principles might produce
> speculative claims; (4) the existence of more direct victims of
> the alleged antitrust violations; and (5) the potential for
> duplicative recovery or complex apportionment of damages."

*Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232–33 (3d Cir. 2013) (citing

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir.1993)). Of

these, the second factor, antitrust injury, "is a necessary but insufficient condition of antitrust

standing. If it is lacking, [the Court] need not address the remaining [] factors." *Id.* (internal

citations omitted).

"[T]he existence of antitrust injury is not typically resolved through motions to

dismiss," although courts can and do decide these issues at the 12(b)(6) stage." *In re*

*Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 684 (E.D. Pa. 2014) (citing *Schuylkill Energy*

*Res., Inc. v. Pa. Power & Light Co.,* 113 F.3d 405, 416–19 (3d Cir.1997)). "At the motion-to-

dismiss stage, a plaintiff must allege more than that it has suffered an injury causally linked

to a violation of the antitrust laws," but rather an "antitrust injury, which is to say injury of the

type the antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful.'" *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791

F.3d 388, 393 n. 3 (3d Cir. 2015), *cert. denied,* 137 S. Ct. 446, 196 L. Ed. 2d 328 (2016)

(citing *Pace Elecs., Inc. v. Canon Computer Sys., Inc.,* 213 F.3d 118, 120 (3d Cir.2000)).

This requirement derives from the oft-cited principle that the antitrust laws were "enacted for

the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat,*

*Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, an antitrust claim may

8

be defeated on a motion to dismiss if the allegations do not support the inference that plaintiff suffered an injury proximately caused by conduct intended to harm competition.

In this case, Plaintiffs have not alleged that there are any market-wide anticompetitive effects beyond their own injury. The Third Circuit has "consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001). "Business practices-however unseemly, hurtful, or even otherwise unlawful—do not constitute antitrust violations unless they harm, or at least endanger, competition." *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 695–96 (E.D. Pa. 2007). An antitrust injury must "result from a lessening of competition," even if "there may be an agreement which is harming others in the marketplace." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998),

According to the Amended Complaint, plaintiffs and co-defendants Vitel and Decisive were all competing for Comcast's business. In fact, plaintiffs successfully participated in a competitive process in 2010 and were selected as Comcast's subcontractors alongside Vitel and Decisive. Doc. 41 ¶ 16. Plaintiffs then worked with Comcast for two years until 2012, when Comcast "launched a national subcontractor reduction plan," reducing "the number of regional cable installation firms working with Comcast from 176 in 2009 to 39 in 2012." *Id.* ¶¶ 27, 28. Plaintiffs however, do not allege that the plan decreased Comcast's *overall*

demand for cable installation services, though Comcast did decrease its demand *with respect to Plaintiffs*, who were passed over in favor of Vitel and Decisive.

The case law in this circuit is replete with examples where plaintiffs failed to establish an antitrust claim when they have only alleged injury to their own welfare. In *Irish v. Ferguson*, the court held allegations that defendants conspired to put plaintiffs out of business or to "eliminate [them] from the local real estate market" only showed an injury to plaintiffs themselves, which did not amount to "specific facts showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." 970 F.Supp.2d 317, 366 (M.D. Pa. 2013) (internal citations omitted). Rather, plaintiffs needed to allege that after losing business from a certain consumer, they had no alternatives in the market because that consumer was "the only option available to them...or that Plaintiffs had sought employment at other real estate businesses but were turned away." *Id.* In *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, the Third Circuit held that plaintiff, a tire supplier, suffered no antitrust injury when "it has had the clear opportunity to compete and did compete, sometimes successfully, for the exclusive tire contracts" with defendant, an organization that promoted motorsports races. 614 F.3d 57, 83 (3d Cir. 2010). In *Hughes v. Halbach & Braun Indus., Ltd.*, the court held that plaintiff's allegations that his employer and others conspired to terminate and "blacklist" him from the industry were insufficient to establish an antitrust injury. 10 F. Supp. 2d 491 (W.D. Pa. 1998). "While Hughes insists that he has demonstrated the effect on *his* welfare," the court noted,

10

"it is the absence of an effect upon the marketplace which mandates the dismissal of this claim." *Id.* at 499. Similarly, in *CAE Inc. v. Gulfstream Aerospace Corp.*, the court held that an alleged exclusive agreement between plaintiff's competitor and an aircraft manufacturer (which solicited business from both plaintiff and its competitor) did not cause an antitrust injury, in part because the agreement "resulted from what seems to have been a competitive process that was open to Plaintiff." 203 F. Supp. 3d 447, 455 (D. Del. 2016). Finally, the court in *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.* held that a taxicab group failed to allege antitrust injury against Uber because "[w]hile plaintiffs themselves have undoubtedly suffered injury since Uber began operating in [their market], competition has not." 218 F. Supp. 3d 389, 393 (E.D. Pa. 2016).

Beyond allegations of plaintiffs' own injuries, the Amended Complaint merely alleges—in a conclusory manner—that that the number of installation companies and overall quality of their services were reduced. Doc. 41 ¶ 52. Even assuming that the conclusory statements to be true, "allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322–23 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955). A much more plausible explanation for plaintiffs' termination, which is apparently also endorsed by the Amended Complaint, is that Comcast wanted to streamline its dealings with cable installation subcontractors and chose to work with only larger cable installation companies who could provide cheaper services instead. Doc. 41 ¶¶ 28, 29.

11

*See LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 649 (E.D. Pa. 2017) (finding an alternative explanation to plaintiff's alleged injury when the telemetry devices plaintiff sold were about "three times as costly" as other options and it was more plausible that "the [defendants] Blue Plans have simply decided—whether in a concerted fashion or not—that the benefits of telemetry devices do not (yet) outweigh their costs.")

The Amended Complaint alludes to the fact that these larger "[s]ubcontractors were chosen, in part, for their willingness to work for Comcast for free by not acknowledging or billing for service calls...[and] their willingness to falsify Comcast performance metrics to give the illusion of improving customer service." Doc. 41 ¶¶ 30, 31. Such alleged dishonest practices, unseemly as they may be, are not necessarily *antitrust* violations.

Plaintiffs have not alleged, for example, whether these alleged dishonest practices by Decisive and Vitel led to the creation of monopolies or potential price increases in the cable installation market. *Cf. Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *16 (E.D. Pa. Sept. 28, 2012) (finding the injury allegations "just skirt past *Twombly/Iqbal* standards" when plaintiff alleged that "[t]here is a dangerous probability that Synthes, by driving Emerge and its other competitors out of business...will achieve a monopoly" and that, "[i]f Synthes is not compelled to cease the above Predatory Anti–Competitive conduct it will achieve a monopoly, and once the monopoly is achieved Synthes will be free to raise its prices back to the high levels that were charged prior to the entry of competition.") Though plaintiffs allege that Vitel and Decisive were able to retain Comcast's business, they have

not alleged if there are barriers to entry in the cable installation market such that Vitel and Decisive will be able to monopolize and subsequently raise their prices or otherwise reduce quality. The Amended Complaint repeatedly refers to the fact that Vitel and Decisive are just two out of 176 firms that were hired by Comcast in 2010, and there were at least 39 firms that were kept on as Comcast's subcontractors in 2012. Doc. 41 ¶¶ 28, 61, 115, 122. It is unclear how Vitel and Decisive would have price influence over the 176 firms who competed for Comcast's business, let alone have influence over the entire cable installation market. *Cf. Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*, 515 F. Supp. 2d 565, 576 (W.D. Pa. 2007) (holding that there may be antitrust injury when plaintiff was "Defendants' *only* competitor in the relevant market, and it was alleged that Defendants' conduct is intended to destroy this competition," thus the "inference [] may be drawn from these averments [] that Defendants' conduct is attempting to destroy *all* competition in the market") (emphasis in original).

Plaintiffs' theory—that Comcast actively conspired with two of its suppliers in order to push out other suppliers—is far less plausible. Comcast, as the end-consumer in the cable installation market, has every motive to select the suppliers it views as the cheapest or easiest to work with. Furthermore, on the face of the Amended Complaint, it is unclear whether plaintiffs have been foreclosed from the cable installation services market, only that they have lost a single—albeit lucrative—client. For example, the Amended Complaint has not pled if plaintiffs sought to obtain business from any other cable service providers after

13

they were terminated by Comcast, whether plaintiffs were forced to leave the market, whether any of the other firms that lost Comcast's business alongside plaintiffs had left the market, or whether the prices of cable installation services had increased due to defendants' behavior. In fact, an inference may be drawn that plaintiffs *were* able to obtain business from elsewhere, as they are still operational at this time, more than 5 years after their contractual relationship with Comcast ended.

The alternative explanation in this case is that Vitel and Decisive, as larger subcontractors, were able to retain Comcast's business during a time when Comcast decided to drastically reduce its number of cable installation subcontractors. The fact that Comcast let go of some of its subcontractors does not proximately cause a reduction of the number of companies in the *overall* cable installation market. Nor does Comcast's decision plausibly cause a reduction of the overall quality of installers' services; especially where, as here, plaintiffs allege that their personnel and inventory were "absorb[ed]" by Vitel and Decisive. Doc. 41 ¶ 69. If Vitel and Decisive were able to continue to employ plaintiffs' equipment and personnel, it is hard to imagine how a reduction of quality has occurred among Comcast's subcontractors, much less among the entire cable installation market. *Philadelphia Taxi Ass'n*, 218 F. Supp. 3d at 393 (the fact that "a portion of Plaintiffs' employees have stopped working for them and now work for Uber" is not reflective of a negative impact in the marketplace).

14

Without allegations beyond the injuries to plaintiffs' own welfare, the Court cannot say that plaintiffs' injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Pace Elecs*, 213 F.3d at 120. Plaintiffs failed to establish that they have antitrust standing to pursue the Sherman Act claim.

## B. Plaintiffs Have Failed to Adequately Plead A Conspiracy Among Defendants.

Notwithstanding the lack of antitrust standing, plaintiffs have also failed to plead the "essence of a Section 1 claim," that is, "the existence of an agreement." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (internal citations omitted). "Evidence of conduct that is as consistent with permissible competition as with illegal conspiracy, without more, will not support an inference of conspiracy." *Id.* In Sherman Act lawsuits, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (internal quotation marks omitted).

The gravamen of plaintiffs' claim is that Comcast has reduced its number of cable installation subcontractors, and in doing so, terminated plaintiffs in favor of co-defendants Vitel and Decisive. Plaintiffs allege that the decision is the result of an insidious agreement between Comcast and co-defendants to "consolidate[e] the market for cable installation in specific municipalities" and otherwise reduce the number of cable installation companies

15

and the quality of their services. Doc. 41 ¶ 52. However, this conclusory allegation is not

supported by the substantive allegations elsewhere in the Amended Complaint, which state

that "*Comcast* launched a national subcontractor plan," that "*Comcast* had no intention of

working with Plaintiffs for the long haul," that "*Comcast* planned to replace smaller

installation companies with larger installation companies that offered less compensation to

[workers]" and that Vitel and Decisive were merely "aware of Comcast's strategy" and were

"informed" of Comcast's decision. Doc. 41 ¶¶ 27, 29, 44, 68, 69. These allegations, on

their face, indicate that Comcast made the decision to terminate plaintiffs by itself, without

influence from or collaboration with Vitel or Decisive.

The Amended Complaint attempts to equate Comcast's decision to share the news

of plaintiffs' termination with a full-fledged conspiracy. But it is not an antitrust violation for

Comcast to "inform[] Defendants Vitel and Decisive that Plaintiffs had been terminated

before it informed Plaintiffs." Doc. 41 ¶ 44. A company informing one of its subcontractors

of its decision to terminate a relationship with another subcontractor does not constitute an

antitrust conspiracy. It is not even an antitrust violation if Comcast had done so in order to

give Vitel and Decisive a chance to "recruit trained technicians" from plaintiffs. *Id.* Vitel and

Decisive's decision to recruit plaintiffs' workers—after Comcast made the decision on its

own to terminate its contract with plaintiffs—is a rational decision reflective of a competitive

market. That plaintiffs lost technicians to competitors and sold their inventory "for pennies

16

on the dollar" to them is typical of the harm that could befall on any competitor in a healthy market.

Furthermore, the Amended Complaint itself alludes to a legitimate reason why Vitel and Decisive may have wanted to employ plaintiffs' personnel and buy up their equipment. It alleges that one weakness in larger cable installation companies is that they do not have rural installation expertise that some of the smaller companies like plaintiffs have. Doc. 41 ¶¶ 63, 64. An obvious alternative explanation here is that after they were informed of plaintiffs' termination, Vitel and Decisive independently sought to acquire plaintiffs' personnel and inventory, Doc. 41 ¶¶ 40–44, presumably to acquire the rural expertise that plaintiffs had. Such "poaching" techniques, even if unethical, do not lead to the inference that Comcast, Vitel, and Decisive made an *a priori* agreement to reduce competition.

Finally, the timeline of events does not support an inference of collusion. The Amended Complaint alleges that Vitel and Decisive were "among the companies slated for termination" according to Comcast's "preliminary determination" made on February 28, 2017, but executives at Comcast "intervened to keep Decisive and Vitel." Doc. 41 ¶¶ 104, 105. Plaintiffs, however, were not saved from the preliminary determination, and were terminated in February 2012 as part of the reduction plan. Doc. 41 ¶ 33. These allegations contradicts the idea that Vitel and Decisive participated in the decision to terminate plaintiffs. Rather, the Amended Complaint clearly paints a picture where Comcast made a unilateral,

17

preliminary decision on February 28, 2012 to eliminate certain subcontractors, and while Vitel and Decisive were eventually "rescued" by Comcast's executives, plaintiffs were not.

This is of course unfortunate and unfair from the plaintiffs' perspective. But the fact remains that Comcast is the consumer selecting subcontractors from the market. Plaintiffs essentially complain that Comcast made the "wrong" choice in picking Vitel and Decisive, because they allegedly engage in fraudulent and corrupt billing practices. They allege, for example, that Vitel and Decisive were willing "to work for Comcast for free by not acknowledging or billing for service calls," and that Decisive "simply eras[ed] evidence of a significant number of service calls" in Comcast's internal system, thereby making its performance data seem more efficient. Doc. 41 ¶¶ 30, 80–83. Notably absent in the Amended Complaint is any allegation that Comcast made a prearrangement with Vitel and Decisive that they should fraudulently bill Comcast—or even an allegation that Vitel and Decisive conspired with each other to fraudulently bill Comcast. Instead, plaintiffs conclusorily allege that Comcast "knew that companies like Decisive…was [sic] actively inflating the quality of their metrics" and Comcast's "regional executives were aware of the corruption of the metrics." *Id.* ¶¶ 94, 97. These conclusory statements, without alleging when Comcast knew about these practices, and whether Comcast had an active role in formulating a conspiracy (as opposed to *post hoc* knowledge of such), are insufficient. As it stands, the factual allegations only suggest that Vitel and Decisive falsified their performance metrics and underbilled Comcast. But these allegations, if true, only evince

fraudulent practices on the part of each individual defendant. It does not follow from the allegations that they are manifestations of an illicit agreement among Comcast, Vitel and Decisive.

In short, the Complaint fails to allege a conspiracy among defendants with the purpose of pushing other cable installation companies out of the market. The direct and proximate cause of plaintiff's injury is Comcast's unilateral decision to reduce the number of suppliers it worked with, which led to Comcast terminating many of its subcontractors, including plaintiffs.[1]

## C. The Allegations of Anticompetitive Effects Are Insufficient Under the Rule of Reason Analysis

Putting aside antitrust standing and lack of a conspiracy issues, plaintiffs have also failed to allege anticompetitive effects as required by the "rule of reason" analysis. Under the rule of reason analysis, the plaintiff "bears the initial burden of showing that the alleged

---

[1] Plaintiffs refer the Court to *Clear Connection*, a case from the Central District of California that concerned a California state law antitrust claim against Comcast. The Court first notes that a case from a district court from another circuit, analyzing a California state law claim, enjoys only persuasive authority in this Court. Second, the plaintiff in *Clear Connection* alleged that Comcast effectively constrained trade by dictating that only one contractor would service a certain territory. *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 149 F. Supp. 3d 1188, 1197 (E.D. Cal. 2015). The *Clear Connection* plaintiff alleged, for example, that it "had a preferred vendor agreement with Comcast to install cable in the Fresno, California, area, but in 2009, Comcast announced a realignment plan that required the installer to serve only Fresno and halt its work elsewhere. Clear Connection said it tried to follow the plan, but Comcast then ended their contract while helping another installer, O.C. Communications, create a monopoly on Comcast cable installation in Sacramento and Fresno." *Id.* at 1198. Unlike the Amended Complaint in this case, the plaintiff in *Clear Connection* had explicitly alleged that Comcast helped O.C. Communications build a monopoly in two cities. Such allegations are missing here; plaintiffs do not allege that Vitel and Decisive enjoy monopoly power in a specific market, or that they were able to raise prices in the cable installation market as a direct result of a conspiracy with Comcast.

[agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *In re Ins. Brokerage*, 618 F.3d at 315 (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir.2005). "Satisfying this burden typically includes a demonstration of defendants' market power." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 222 (3d Cir. 2011) (internal citations omitted).

Plaintiffs argue that the Court should conduct a "quick look" analysis instead. Doc. 56 at 12. However, the "quick look" analysis should be applied "only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005). In contrast, a full "rule of reason" analysis must be conducted when the alleged restraint is "a non-price vertical restraint." *Id.* The allegations in this case at most suggest a vertical agreement between a buyer (Comcast) and service providers (Vitel and Decisive), with the primary purpose of pushing the service providers like plaintiffs out of business, thereby consolidating the market. The allegations do not reflect a price-based restraint, nor is the alleged agreement a horizontal agreement made solely among competitors. In keeping with the Third Circuit's instruction that "virtually all vertical agreements now receive a traditional rule-of-reason analysis," the Court will apply a rule of reason analysis in examining the allegations. *In re Ins. Brokerage*, 618 F.3d at 318.

The relevant market in this case is undeniably the cable installation market, in which plaintiffs and co-defendants Vitel and Decisive compete for the business of cable provider companies, such as Comcast. Yet, in an effort to allege anticompetitive effects beyond their own injuries, Plaintiffs mistakenly conflate two distinct markets. The Amended Complaint alleges that Comcast has "substantial market power as the largest cable company and Internet Service Provider in the United States." Doc. 41 ¶ 129. That may well be true in the cable and internet service provider industry, where Comcast is a *seller* of cable content and services. But the present case concerns Comcast's role as a *buyer* in the cable installation market. It does not matter how much market power Comcast has in the cable-provider industry, rather, it matters how much market power Comcast has in the cable installation industry.

Plaintiffs allege that defendants conspired to "consolidat[e] the market for cable installation in specific municipalities in Pennsylvania, West Virginia, Virginia, and Maryland." Doc. 41 ¶ 52. Assuming this allegation properly defined the relevant market, there are no allegations that Comcast enjoys substantial market power as a *buyer* in this space. Even if plaintiffs had properly alleged buy-side market power—which they did not—such allegations would only support the idea that Comcast is a "monopsony" firm. "Monopsony power is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007) (citing Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297

(1991)). The Third Circuit has said that without proper allegations of a conspiracy, "[a] firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *West Penn*, 627 F.3d at 103. *See also LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 650 (E.D. Pa. 2017) (holding that "Defendants' refusal—whether concerted or not—to purchase any telemetry device…is not an antitrust violation, but rather a legal exercise of Defendants' monopsony power.")

*West Penn* is instructive on antitrust claims in the monopsony context. In that case, the Third Circuit held that plaintiffs there adequately pled an antitrust injury when the complaint alleged "that [Defendant] Highmark has a 60%–80% share of the Allegheny County market for health insurance, that there are significant entry barriers for insurers wishing to break into the market…that medical providers have very few alternative purchasers for their services…[that co-Defendant] *UPMC insulated Highmark from competition in return for Highmark's taking steps to hobble West Penn*…and that Highmark did not pass the savings on to consumers [but] instead, that Highmark pocketed the savings." *Id.* at 103–04 (emphasis added). Plaintiffs in this case, by contrast, have not made such detailed allegations.

In particular, *West Penn* included allegations of an explicit *quid pro quo* agreement, the primary purpose of which was to reduce competition for the benefit of each defendant: it was alleged that an insurer, Highmark, and one of its service providers, UPMC, arrived at a

22

"truce" where "each entity would use its market power to protect the other from competition." *Id.* at 93. When plaintiffs sought financing assistance from Highmark, "it declined to do so out of fear that UPMC would retaliate against it for violating their agreement—an agreement that Highmark candidly admitted was 'probably illegal.'" *Id.* When plaintiffs sought to renegotiate reimbursement rates with Highmark, Highmark "acknowledged that the rates were too low and initially agreed to raise them," but later declined to do so "citing its agreement with UPMC, under which it was not to do anything to benefit West Penn financially." *Id.* at 103. In analyzing these allegations, the Third Circuit noted that "had Highmark been acting alone, West Penn would have little basis for challenging the reimbursement rates." *Id.* As "[a] firm that has substantial power on the buy side of the market," Highmark was "generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *Id.* Thus, save allegations of an illicit agreement to reduce competition, a buyer is free to negotiate, bargain, or terminate the services it pays for.

The Amended Complaint further alleges that Comcast's cable service customers have suffered a price increase "nationally." Doc. 41 ¶¶ 57, 58. Again, Plaintiffs conflate two different markets—while Comcast is a *buyer* in the cable installation market, it is a *seller* in the cable provider market—the fact that there are increased costs in the latter is not a proximate result of fewer installation firms in the former. If anything, the alleged underbilling and falsified invoices by Vitel and Decisive in order to retain Comcast's business would have led to lower costs for Comcast. Without more allegations connecting the alleged

23

effects in these two distinct markets, the Court cannot say that the one proximately caused the other. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F. Supp. 1055, 1063 (E.D. Pa. 1996) (holding that Plaintiffs' antitrust claim failed as a matter of law because "[t]here are no allegations in the amended complaint relating to higher prices or restricted choice at the consumer level") *aff'd,* 124 F.3d 430 (3d Cir. 1997).

Finally, the Court notes that a plain reading of the Amended Complaint would indicate that Plaintiffs are complaining of a breach of contract—plaintiffs entered into a three-year contract with Comcast, and relying on the contract, "ramped up" their inventory and personnel for the incoming service requests, but Comcast then terminated the contract after only two years. Doc. 41 ¶¶ 24, 33, 34. And if the allegations of Vitel and Decisive's dishonest billing practices are indeed true, they may form the basis for consumer fraud, unjust enrichment, or misrepresentation claims. However, violations of common law or state law do not give rise to antitrust injury. *See Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.,* 218 F. Supp. 3d 389, 394 (E.D. Pa. 2016) ("If Plaintiffs seek to prevent Uber from operating in the Philadelphia market, it may seek refuge in PPA regulations, not antitrust law").

The Amended Complaint failed to plausibly plead antitrust standing, conspiracy, or anticompetitive effects within the relevant market. Count I will be dismissed with leave to amend so that plaintiffs may attempt to allege sufficient facts to show that they have an actionable Sherman Act claim.

## D. The Statute of Limitations Defense Cannot Be Resolved on Defendants' Motions to Dismiss

Alternatively, all three of the Defendants raise a statute of limitations defense, based on the allegation that plaintiffs were notified by letter in February 2012 "that their long-term relationships... would be terminated on May 27, 2012." Doc. 41 ¶ 33. Plaintiffs argue that because the termination was not "formalized" until May 27, 2012, their suit has come right under the wire, as it was filed on May 26, 2016.

A suit to recover damages for a violation of the Sherman Act must be "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. "[A]n antitrust cause of action generally "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." *West Penn*, 627 F.3d at 106 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). "However, [i]n the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act." *Id.*

Comcast argues that the May 2012 formalization of the termination was a mere "reaffirmation" of the February notice, and is thus insufficient to invoke the continuing conspiracy exception to the statute of limitations. Doc. 58 at 14. However, the Third Circuit has conclusively held that suits may be "timely even though the acts that occurred within the

limitations period were reaffirmations of decisions originally made outside the limitations period." *West Penn*, 627 F.3d at 106.

In any case, the Court cannot determine at this stage whether the May 2012 "formalization" is an overt act of reaffirmation or an "unabated inertial consequence" of a previous act. *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *3 (E.D. Pa. July 13, 2005). The Amended Complaint does not quote the relevant language in the February 2012 letter, or attach a copy of the letter itself. None of the parties attached the February 2012 letter to their motion papers, or explained what the May 2012 "formalization" meant. Without more, the Court cannot determine if the February 2012 letter is a conclusive termination of the contractual relationship, or if it contains any conditional phrasing that may undermine the finality of termination. And without an explanation from any of the parties what the May 2012 "formalization" process consisted of, the Court cannot say that it is a separate, overt act or otherwise. The statute of limitations issue may not be resolved on the motions to dismiss.

## E. The Amended Complaint Does Not Plausibly Allege An Employment Discrimination Claim

Plaintiffs append an employment discrimination claim to their antitrust claims, alleging that they were passed over in favor of Vitel because Comcast wished to "bolster its paltry efforts at increasing diversity in the cable industry," and Vitel happened to be "tracked as diverse, [while] plaintiffs were not." Doc. 41 ¶¶ 112, 118. Plaintiffs essentially attempt to

plead a "reverse discrimination" claim, because they allegedly lost Comcast's business due to the fact they are "owned and operated by Caucasian people" and thus "not 'diverse.'" *Id.* ¶ 119.

The Third Circuit has adopted a modified *McDonnell Douglas* standard in reverse discrimination cases. *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir.1999). To establish a *prima face* case of reverse discrimination, the plaintiff must present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of [his] race, color, religion, sex, or national origin." *Id.* (internal quotations and citations omitted). At the motion to dismiss stage, Plaintiffs need not *prove* the elements of a *prima facie* case, but they "must still state a plausible claim." *Byrd v. Elwyn*, 2016 WL 5661713, at *9 (E.D. Pa. Sept. 30, 2016).

First, the court notes that there is nothing unlawful—and in fact some may argue that it is laudable—for a private company such as Comcast to engage in efforts to increase the diversity of its products or its subcontractors. Second, and of legal significance, Plaintiffs have only alleged that Comcast is facing concerns about its "ability to develop and deliver television content relevant to a diverse society" and has committed to developing "ten minority-owned cable channels." These allegations, while factually substantive, are about programming content Comcast produces for its own customers. Again, plaintiffs are cable installation companies. They are neither buyers of Comcast's cable content nor competitors

27

with Comcast in producing cable content. Comcast's commitment to develop more diverse cable programming has nothing to do with how it selects its cable installation subcontractors. As with the antitrust claim, plaintiffs improperly conflate their own market with the cable provider market.

In the actual market in which plaintiffs operate, the cable installation market, plaintiffs have failed to muster any substantive, factual allegations supporting a discrimination claim. Plaintiffs do not allege, for example, how many of the original 176 cable installation companies hired by Comcast were minority or Caucasian owned, if there are any "diverse" cable installation companies that are comparable to plaintiffs in size, regions served, or types of services provided, and if there are, whether those comparable "diverse" companies were retained by Comcast. *See Byrd*, 2016 WL 5661713, at \*9 (dismissing plaintiff's reverse gender discrimination claim because he failed to allege a reverse gender discrimination claim, since he "[did] not allege that the promoted women were elevated to positions that would have been a promotion from his own position, nor d[id] he allege how many of the six women were promoted and how many were hired.") Furthermore, it cannot be said that Vitel is a comparable firm to plaintiffs, as the Amended Complaint repeatedly allege that Vitel is a "larger" firm that enjoys the concomitant advantages in gaining Comcast's business. *Id.* ¶ 29, 80, 87. Thus, plaintiffs have not plausibly alleged that they were passed over in favor of Vitel *because of* their race. In fact, the Amended Complaint undermines itself in this regard because it accuses Vitel of inducing Comcast into retaining

28

its business because it falsifies invoices and underbills Comcast. Save for the conclusory allegations that Plaintiffs are "owned and operated by Caucasian people" and that "Vitel was tracked as diverse," Doc. 41 ¶¶ 118, 119, plaintiffs have failed to plead that they were treated unfavorably because their owners are Caucasian.

Count V is dismissed with leave to amend so that plaintiffs may attempt to allege sufficient facts to show that they were treated less favorably than other subcontractors because of their owners' race.

### F. The Court Declines to Exercise Jurisdiction Over the Pendent Claims

Having determined that Plaintiffs' federal antitrust claims must be dismissed, the Court will dismiss plaintiffs' pendent state law claims. Doc. 41, Counts II, III, and IV. The decision whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) is subject to the district court's discretion. 28 U.S.C. § 1367(c)(3) ( "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction.") "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) (internal citations omitted). In light of the dismissal of the federal claims, the Court declines to exercise

supplemental jurisdiction over Counts II, III, and IV and will dismiss those claims without prejudice.

## V. Conclusion

For the reasons outlined above, Defendants' motion to dismiss the Amended Complaint (Doc. 41) will be granted. The Amended Complaint will be dismissed without prejudice with leave to file a Second Amended Complaint. A separate Order shall issue.

Robert D. Mariani
United States District Judge