THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CABLE LINE, INC. and         :
MCLAUGHLIN COMMUNICATIONS  :
INC.                              :
                                 :
          Plaintiffs,          :
      v.                     :     3:16-CV-1000
                                 :     (JUDGE MARIANI)
COMCAST CABLE COMMUNICATIONS :
OF PENNSYLVANIA, INC., et al.,    :
                                 :
         Defendants.       :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This opinion addresses a second round of motions to dismiss after Plaintiffs'

Amended Complaint was dismissed with leave to amend on October 18, 2017. Doc. 68.

Plaintiff filed a Second Amended Complaint ("SAC") on November 21, 2018. Doc. 71. All

three Defendants moved to dismiss the SAC. Docs. 77, 79, 81. While Plaintiffs added

certain new allegations in the SAC, the core of Plaintiffs' complaint remained the same—

Comcast, which once employed Plaintiffs as cable installation subcontractors, terminated

Plaintiffs and many others in an effort to reduce its costs and streamline its subcontractor

operations. Doc. 71 ¶¶ 40, 41. As a result, Plaintiffs lost the business of a lucrative client,

while Defendants Decisive and Vitel, who were also Comcast's subcontractors, were able to

retain Comcast's business. Id. ¶ 42.

The Court assumes the parties' familiarity with the facts, given the parties' extensive

1

briefing on the matter and this Court's previous motion to dismiss opinion. Doc. 67. Thus, this memorandum will primarily address the new and relevant allegations from the SAC. For reasons stated below, the Court reaffirms the legal principles and its analyses found in its previous opinion. The SAC will be dismissed with prejudice because Plaintiffs failed to cure the defects specified in this Court's previous opinion.

## II. FACTUAL ALLEGATIONS

Plaintiffs are cable installation companies that were former subcontractors of Comcast Cable Communications of Pennsylvania, Inc. ("Comcast"). Plaintiffs brought suit against Comcast and two other cable installation subcontractors, Vitel and Decisive, for alleged violations under the Sherman Act and state antitrust laws, as well as an employment claim against Comcast for reverse discrimination. Doc. 71. Comcast is a cable television company and an internet service provider, which "offer[s] broadband, cable-based Internet access" to individual consumers. *Id.* ¶¶ 11, 16. In order to service its customers, Comcast subcontracts with certain cable installation companies such as Plaintiffs and Vitel and Decisive, to install fiber optic cables and hardware. *Id.* ¶¶ 16, 29. In 2009, Comcast subcontracted with approximately 176 regional cable installation companies. *Id.* ¶ 41. In their previous complaint, which was dismissed by this Court, Plaintiffs alleged that they "competed successfully in a 2010 Request For Proposal [RFP] process." Doc. 41 ¶ 16. However, the SAC changed the allegation to "Plaintiffs mistakenly believed they competed successfully in [the RFP] process because they were told to 'ramp up' in certain

2

Divisions [by Comcast]." Doc. 71 ¶ 30. The SAC alleges that operating under this mistaken assumption, "Plaintiffs 'ramped up' their operations, costing them hundreds of thousands of dollars to more likely over a million dollars." *Id.* ¶ 38. However, "Comcast never awarded any contracts pursuant to the RFP." *Id.* ¶ 39. Instead, Comcast initiated a "national subcontractor reduction plan" that called for a reduction of Comcast's cable installation subcontractors to 39 firms, which resulted in the termination of its relationship with Plaintiffs in 2012, while Decisive and Vitel were among the firms that were kept on by Comcast. *Id.* ¶¶ 42, 58. Plaintiffs allege that Comcast conspired with Vitel and Decisive to transition Plaintiffs' cable installation responsibilities to them and "helped develop a monopoly for Vitel and Decisive in the Regions that the Plaintiffs worked." *Id.* ¶¶ 170-174. Due to the loss of Comcast's business, Plaintiffs were forced to close down their business. *Id.* ¶¶ 82-84. The SAC further alleges that by hiring only a few regional cable installation companies, "Comcast controlled the price and pushed down the price of cable installation," with "the only benefit [going] to Comcast, Decisive, and Vitel," while installation workers' "wages decreased and the amount of hours employees had to perform increased." *Id.* ¶¶ 99-102. In support, the SAC cites certain newspaper articles from 2016, which purportedly reported poor working conditions for cable installation employees. *Id.* ¶¶ 90-96. Plaintiffs also allege, for the first time, that Comcast had bought up other cable providers, i.e. its competitors, "[i]n the very late 1990's…into the early 2000's" and that Comcast "used a non-compete agreement to block the sale of [Plaintiff]" to Comcast's competitor, Exelon, "in the

3

early 2000's." *Id.* ¶¶ 10, 15, 24, 78.

Additionally, Plaintiffs rehashed their previous allegations that Decisive and Vitel were retained by Comcast was because they were able to underbill Comcast and manipulate performance metrics, thereby "saving Comcast hundreds of millions up to a billion dollars." *Id.* ¶¶ 43-57. Plaintiffs also allege that Vitel "misappropriated and resold hundreds of thousands of dollars of Comcast equipment." *Id.* ¶ 165. Yet, despite these practices, Comcast continued to retain Decisive and Vitel because "it benefitted them with their shareholders, rising stock prices, and a higher profitability." *Id.* ¶ 139.

Finally, the SAC restates Plaintiffs' reverse employment discrimination claim, largely relying on allegations from the Amended Complaint. The Court previously dismissed this claim for failing to raise an inference that Plaintiffs' termination was motivated by their owners' race, as opposed to other factors abundantly pleaded in their Amended Complaint. Doc. 67 at 26-29. The only new, substantive allegations in the SAC relating to employment discrimination are that Vitel was chosen over Plaintiffs even though both had "over 100 trucks" and "Plaintiffs performed as well, or better, as Defendant Vitel at installing cable." Doc. 71 ¶¶ 181, 195.

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim

4

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

5

citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. 679).

## IV. ANALYSIS

### A. Plaintiffs Continue to Fail to Allege Antitrust Injury, Conspiracy, and Anticompetitive Effects in the Relevant Market

The essence of Plaintiffs' allegations is that Comcast, in order to reduce costs and streamline operations, dramatically decreased its number of cable installation subcontractors through a "national subcontractor reduction plan." Doc. 71 ¶¶ 40, 41. As a consequence, Plaintiffs, who were two of Comcast's installation subcontractors, lost the business they had previously enjoyed with Comcast, while Defendants Decisive and Vitel, who were also Comcast's subcontractors, were chosen by Comcast to continue to retain its business. *Id.* ¶ 42. In its previous opinion, this Court held that the Amended Complaint did not state an antitrust action because Plaintiffs (1) failed to plead antitrust injury because they only alleged injury as to themselves, not to competition in the marketplace, (2) failed to plead a conspiracy among Defendants, but instead, consistently alleged unilateral decision-making by Comcast, and (3) failed to allege anticompetitive effects as required by the "rule of reason" analysis. Doc. 67. Because the SAC fails to adequately cure any of deficiencies enumerated by this Court, Plaintiffs continue to fail to state a claim under the Sherman Act.

First, Plaintiffs' injury does not flow from anticompetitive behavior, but rather, from

6

the termination by a single client, Comcast. This Court noted in its previous opinion that to plead an antitrust claim, Plaintiffs must first allege the threshold element of antitrust injury, that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). This requirement ensures that antitrust laws are enforced "for the protection of competition, not competitors." *Id.* at 488. After all, Section 1 of the Sherman Act does not prohibit all agreements among market participants, but only those aimed to create "*unreasonable* restraints of trade." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911)) (emphasis in original).

As the Third Circuit recently held, "[c]ompetition is at the heart of the antitrust laws; it is only anticompetitive conduct, or 'a competition-reducing aspect or effect of the defendant's behavior,' that antitrust laws seek to curtail." *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). In *Philadelphia Taxi Ass'n*, the Court noted that Appellants, Philadelphia taxi drivers, cannot plead antitrust injury by simply alleging that their own business was harmed when a powerful competitor, Uber, entered the market:

> [a]llegations of purportedly anticompetitive conduct are meritless if those acts would cause no deleterious effect on competition. This is where the SAC falters: Appellants set forth a litany of ways in which Uber's entry into the market has harmed Appellants' business and their investment in medallions;

yet none of the allegations demonstrate a harmful effect on competition.

*Id.* at 339. *See also Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (noting that the Third Circuit has "consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market."). An antitrust injury must "result from a lessening of competition," even if "there may be an agreement which is harming others in the marketplace." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998).

Despite having three chances to plead antitrust injury, the SAC still falls short of pleading negative impact beyond Plaintiffs' own injury. The SAC offers no new substantive allegations as to whether there are any buyers for Plaintiffs' cable installation services aside from Comcast, whether Plaintiffs attempted to obtain their business after being terminated by Comcast, or whether Defendants' actions led to more barriers to entry for cable installation companies. *See, e.g.,* Doc. 71 ¶ 82 (declaring that "if Comcast was not using your cable installation company, there was no work," without alleging that Plaintiffs actually tried to find business elsewhere after losing Comcast as a client, or that companies similar to Plaintiffs tried and failed to find business after being terminated by Comcast).

In addition, there is no indication that there was an overall decrease in demand for cable installation services. While Plaintiffs allege that a single buyer, Comcast, decreased its demand for cable installation services *as to Plaintiffs*, they have not alleged that Comcast

decreased its demand for such services overall, nor that other buyers of installation services besides Comcast decreased their demand for such services. In other words, the SAC fails to allege that the overall demand for cable installation services suffered. *Cf. Philadelphia Taxi Ass'n*, 886 F.3d at 342 (holding that Appellants failed to allege attempted monopolization claim when they only argued that Uber "pushed numerous competitors out of the market" but did not "allege anticompetitive practices by Uber" or "mention Uber's market share; [the complaint] merely suggests that Uber and medallion taxicabs had similar numbers of vehicles operating in Philadelphia....This allegation falls short of indicating Uber's market share in the context of all the competitors in the Philadelphia taxicab market, such as other [Transportation Network Companies].")

In fact, the SAC blithely alleges that "there was no longer the same demand for the amount of services by different companies since all the services were being channeled into Vitel and Decisive." *Id.* ¶ 80. This only reveals Plaintiffs' confusion over what constitutes antitrust injury, as they appear to concede that Comcast continued to have a healthy demand for installation services, only it chose to channel its demand to Plaintiffs' competitors, as opposed to Plaintiffs. Once again, a plaintiff's "own injury, namely, financial hardship," without more, cannot be used to in place of pleading "an antitrust injury, such as a negative impact on consumers or to competition in general, [or] any link between this impact and the harms Appellants have suffered." *Philadelphia Taxi Ass'n*, 886 F.3d at 344. But "harm to [Plaintiffs'] business does not equal harm to competition." *Id.* "Conduct that

9

merely harms competitors...while not harming the competitive process itself, is not anticompetitive." *Id.* (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007)).

As the Court's previous opinion found, Plaintiffs' injury flows from their loss of "a single—albeit lucrative—client." Doc. 67 at 13. This type of injury does not amount to a decline in *competition* in the overall cable installation market. If anything, Comcast's subcontractor reduction plan, which the SAC alleges was the result of Comcast's effort to select subcontractors with the lowest prices, is exactly the type of competition that antitrust laws are meant to foster. In fact, the SAC repeatedly alleges that Comcast chose its subcontractors by "determin[ing] the lowest amount that Comcast could pay Plaintiffs and other cable installation companies" and by measuring the quality of its subcontractors through the use of performance metrics. *Id.* ¶¶ 27,125, 130-31. In particular, the SAC alleges that "Comcast chose to work with Decisive and Vitel to . . . drive down labor costs" and that Decisive and Vitel were chosen because they could "absorb those losses in order to be allocated a larger share of the market." *Id.* ¶ 172. These allegations, if true, would only give rise to an inference that Comcast tried to reduce its costs, which may benefit its ultimate consumers. In sum, the SAC complains of the fact that Decisive and Vitel were able to reduce their rates to seem more attractive to Comcast, and were rewarded with a larger volume of Comcast's business over Plaintiffs—this is precisely the type of competitive behavior that antitrust laws are meant to foster, not deter. Even if Decisive and Vitel's

competitive rates led to the byproduct of pushing other competitors, such as Plaintiffs, out of the market, it cannot be labeled as "anticompetitive" behavior because "[c]utting prices in order to increase business often is the very essence of competition." *Philadelphia Taxi Ass'n*, 886 F.3d at 340 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

For the same reasons, the SAC's allegations that Comcast "helped develop a monopoly for Vitel and Decisive in the Regions that the Plaintiffs worked" and that "Vitel and Decisive are able to enjoy monopoly power in these markets because they were the only company[ies] able to have better rates" are without merit. Doc. 71 ¶¶ 157-58, 174. First, Vitel and Decisive cannot both be monopolies in the same regions. A "monopoly exists when *one firm* controls all or the bulk of a product's output, and no other firm can enter the market or expand output at comparable costs." *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 284 (D.N.J. 2003) (quoting 2 PHILLIP AREEDA, JOHN SOLOW, AND HERBERT HOVENKAMP, ANTITRUST LAW, ¶ 403 at 7 (2d ed. 2002) (emphasis in original). Second, and more importantly, the SAC concedes that Vitel and Decisive were able to obtain a large share of Comcast's business *because* they offered the most competitive rates. The natural result of competition, without allegations of reduced output or barriers to entry, does not raise an inference of a monopoly.

Plaintiffs also continue to allege that Vitel and Decisive were able to charge lower rates by underbilling Comcast and manipulating their performance metrics in Comcast's

system, and that Comcast was aware of this behavior, but did not terminate Decisive and Vitel because it "lowered Comcast's bottom line, pleasing shareholders and increased stock prices." Doc. 71 ¶¶ 44-57, 172. However, as the Court stated in its previous opinion, the allegations of fraudulent underbilling by Decisive and Vitel, even if true, "may form the basis for consumer fraud, unjust enrichment, or misrepresentation claims," but "violations of common law or state law do not give rise to antitrust injury." Doc. 67 at 24. This principle was recently reaffirmed by the Third Circuit in *Philadelphia Taxi Ass'n*, which stated that illegal conduct cannot serve as a basis for antitrust injury:

> Even if Uber were able to cut costs by allegedly violating [Philadelphia Parking Authority] regulations, Appellants cannot use the antitrust laws to hold Uber liable for these violations absent proof of anticompetitive conduct. Even unlawful conduct is 'of no concern to the antitrust laws' unless it produces an anticompetitive effect....
>
> [Appellants] attempt to circumvent the antitrust injury requirement by focusing on how Uber's purportedly illegal operation enabled it to cut costs and increase its market share. But again, the Supreme Court has squarely rejected illegal conduct as a basis for antitrust injury. A competitor's illegal presence in a market is not a per se antitrust violation, and any resulting injury is alone insufficient for a private plaintiff to state an antitrust injury.

886 F.3d at 340, 345 (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). *See also Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) (explaining that to establish antitrust injury, "plaintiffs must prove more than harm causally linked to an illegal presence in the market"). Thus, while Vitel and Decisive's alleged business tactics may be unsavory or fraudulent, they do not morph Plaintiffs' allegations into an antitrust cause of action.

12

Because Plaintiffs continue to confuse harm to their own welfare as harm to the entire market, they have yet again failed to plead antitrust injury.

Second, even if Plaintiffs had adequately pleaded antitrust injury, their claims would nonetheless fail because they have failed to plead an illegal agreement to lessen competition among the Defendants. "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *West Penn*, 627 F.3d at 99 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). In its previous opinion, this Court found Plaintiffs' allegations did not give rise to an inference of conspiracy, but rather, suggested that Comcast unilaterally decided to reduce its number of subcontractors, while Decisive and Vitel were merely informed of Comcast's decision. Doc. 67 at 16. The SAC does not cure this shortcoming. Instead, it continues to assert that "Defendants Vitel and Decisive *subsequently* became aware of Comcast's strategy." Doc. 71 ¶ 123. It also continues to suggest that all actions that led to Plaintiffs' harm were made by Comcast and Comcast alone. For example, the SAC alleges that in 2009 to 2010, "Comcast placed a Request for Proposal (RFP) seeking proposals from all of the cable installation companies that were working for Comcast at the time," and "Plaintiffs mistakenly believed they competed successfully in a 2010 Request For Proposal ("RFP") process because they were told to 'ramp up' in certain Divisions." *Id.* ¶¶ 27-30. Plaintiffs then invested "hundreds of thousands of dollars to more likely over a million dollars" in their operations, by purchasing

new warehouse facilities, vehicles, real estate, and office space, as well as hiring and training new employees. Id. ¶¶ 36-38. However, to Plaintiffs' misfortune, "Comcast never awarded any contracts pursuant to the RFP." *Id.* ¶ 39.

The SAC also alleges that in 2009, "*Comcast* launched a national subcontractor reduction plan from its Philadelphia corporate headquarters," which "called for a reduction in the number of regional cable installation firms working with Comcast from 176 in 2009 to 39 in 2012," and that "*Comcast* had no intention of working with Plaintiffs or many other of the subcontractor/business partners for the long haul." *Id.* ¶¶ 40-42 (emphasis added). The SAC then alleges that in 2012, "*Comcast* sent a letter to Plaintiffs stating that their long-term relationships would be terminated." *Id.* ¶¶ 58 (emphasis added). It is also alleged that "*Comcast* chose to work with Vitel and Decisive" because they offered lower labor costs and manipulated their performance metrics. *Id.* ¶ 172. *See also id.* ¶¶ 130-31 (alleging that "*Comcast* developed a proprietary customer database, Cable Data, to track its subcontractor metrics" and that "*Comcast* would tally metrics data and identify the highest and lowest scoring subcontractors.") (emphasis added). Notably absent in these allegations is any indication that Decisive and Vitel had any influence over Comcast's unilateral decision to reduce its number of subcontractors and work only with those that offered the

lowest rates.[1] Thus, by Plaintiffs' own allegations, their injury arises solely from unilateral decisions made by Comcast.

Furthermore, as the Court's previous opinion noted, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." Doc. 67 at 15 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010)). Here, the obvious explanation of the events is that Comcast decided to streamline the number of subcontractors it worked with, which resulted in the termination of Plaintiffs in favor of Vitel and Decisive, who in turn hired some of Plaintiffs' personnel and bought their inventory after Plaintiffs' termination. *See* Doc. 71 ¶¶ 71-77. These allegations further undermine the idea that competition in the cable installation market suffered, as the SAC appears to acknowledge that Decisive and Vitel, by attracting a larger volume of business from Comcast, were also able to employ more cable installation employees and bolster their operations. *See Philadelphia Taxi Ass'n*, 886 F.3d at 341("Appellants acknowledge that the nearly 1200 medallion taxicab drivers that Uber recruited did not remain idle, but rather they drove for Uber. In sum, what Appellants allege does not give rise to an inference of anticompetitive or exclusionary

---

[1] The SAC also alleges, for the first time, that after it terminated Plaintiff Cable Line, Comcast "gave Cable Line a 1 year contract; this was a complete farce to try to cover up the fraudulent activities, because Comcast never gave Cable Line any work in accordance with the contract, nor did Comcast have any intention to give them work." *Id.* ¶ 83. This allegation further undermines Plaintiffs' contention that their termination was the result of an agreement among all three co-defendants, as opposed to an independent decision by Comcast.

conduct and suggests, if anything, that Uber's ability to attract these drivers was due to its cost efficiency and competitive advantage.").[2]

In fact, Plaintiffs' own brief belies any notion that Comcast would have a plausible motive for conspiring with Decisive and Vitel. The brief describes the conspiracy as one where "Vitel and Decisive would do work at lower than cost rates, Comcast would get rid of all the competition, and Vitel and Decisive would get the majority of installation work and be able to charge higher for the installation work at a later date since virtually all of the competition in the market area would be eliminated." Doc. 90 at 2. Plaintiffs conveniently leave out the fact that these higher charges would presumably be *charged to Comcast*, which would dampen any motive on the part of Comcast to engage in an illegal conspiracy to drive up its own subcontractor costs. Similarly, elsewhere in their brief, Plaintiffs argue that Decisive and Vitel was "able to charge a rate below market in which these Defendants then would be able to recoup such undercharges once the competition was eliminated," and that Comcast "exercise[d] its monopsony power by only contracting with Vitel and Decisive," leading to Vitel and Decisive being "able to make higher than market profits," without explaining why Comcast would agree to a scheme that would lead to an increase in their

---

[2] The SAC also claims that working conditions for cable installation employees deteriorated after Comcast reduced its number of installation subcontractors, but offer no explanation, plausible or otherwise, as to why the working conditions of individual workers are relevant to a conspiracy among the Defendants to consolidate the market for cable installation companies. Doc. 71 ¶¶ 99-104, 129. In any event, the allegations of declining working conditions are based upon news articles written in 2016. *Id.* ¶¶ 90-96. Plaintiffs, however, were terminated in 2012. Thus, even assuming that employees' working conditions are relevant to the alleged antitrust conspiracy, it is unclear how these temporally remote articles would be relevant to the core events at issue.

own subcontractors' rates. *Id.* at 4, 34.

In place of allegations providing a plausible explanation as to why Comcast would enter into a conspiracy contrary to its own interests, the bulk of Plaintiffs' new allegations are vague and conclusory. For example, the SAC alleges that "[b]etween February 28, 2012 and May 27, 2012, Comcast agreed with Defendants Vitel and Decisive to allocate regional cable installation markets" and that "[t]he purpose and effect of Defendants' actions was not just to change Comcast's preferred installation vendors: it was to eliminate competitors to Vitel and Decisive." Doc. 71 ¶¶ 62, 79. These allegations of an agreement are not only conclusory, but they cannot be squared with the SAC's substantive allegations elsewhere that Comcast independently arrived at the decision to work with Vitel and Decisive, because they offered lower costs and better performance metrics (whether fraudulently obtained or otherwise. *See, e.g., id.* ¶¶ 27, 159-161. Likewise, the SAC's allegation that due to the conspiracy, Decisive and Vitel "were subsequently able to charge more for installation services and pass it on to the ultimate consumer," i.e. Comcast, defies logical inference—again, Comcast has no motive to enter into a conspiracy where its own subcontractors would be able to charge higher rates. *Id.* ¶ 105. In fact, the most substantive allegations that may be read as approximating an agreement are Plaintiffs' original allegations that Comcast was aware "of the manipulation of the metric system by Decisive and/or Vitel," and that Decisive and Vitel "subsequently became aware of Comcast's strategy" to eliminate many of its subcontractors through its subcontractor

reduction plan. Doc. 71 ¶¶123, 139. But as this Court's previous opinion found, mere awareness of other market participants' actions does not constitute an *a priori* agreement to restrain trade. Doc. 67 at 16-17.

The fundamental flaw of Plaintiffs' complaint was—and remains—that even though Comcast may have an motive to reduce its number of cable installation subcontractors, it has no incentive to conspire with its own subcontractors to *eliminate competition* in the overall market and *increase the prices* for the services it was buying. Absent substantive, plausible allegations justifying such a conspiracy, the SAC fails to adequately allege that Plaintiffs suffered harm from an agreement entered into by Defendants to restrain competition. *Cf. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255-56 (3d Cir. 2010) (concluding that "simply because each Dealer, on its own, might have been economically motivated to exert efforts to keep [manufacturer's] business and charge the elevated prices [manufacturer] imposed does not give rise to a plausible inference of an agreement among the Dealers themselves… [plaintiff's allegations] do no more than intimate 'merely parallel conduct that could just as well be independent action.'") (quoting *Twombly*, 550 U.S. at 566).

Third, even if the SAC had adequately pleaded antitrust injury and conspiracy, the claim would still fail under a rule of reason analysis. In an antitrust action, the plaintiff carries the "initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *In re Ins. Brokerage*, 618 F.3d

18

at 315 (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir.2005)). For reasons stated above, Plaintiffs have failed to plead anticompetitive effects beyond their own injury. Furthermore, they continue to fail to define a relevant market. Instead, the SAC makes vague claims that Comcast was "the largest purchaser for cable installation in the United States in the relevant markets," and that "within a specific community where it held the cable franchise, Comcast would be the sole purchaser of cable installation services," even though it is unclear what these "relevant markets" or "specific communit[ies]" are. Doc. 71 ¶¶ 13, 34.

However, the SAC did add some new allegations that may be read as an attempt to define a geographical market by making vague references to the "Northern Division," which purport to include certain parts of Pennsylvania, New Jersey, Ohio, Maryland, Delaware, Washington DC, Virginia, Connecticut, Massachusetts, Vermont, New Hampshire, and Maine. *Id.* ¶ 23. However, the SAC does not provide any justification for defining the market in this manner. In fact, references to the "Northern Division" often include other geographic areas in the same assertions. *See, e.g., id.* ¶ 86 (alleging that "[m]any other cable installation companies in the Northern Division *and in fact other Divisions*...that were terminated by Comcast, all went out of business"); *id.* ¶ 88 (alleging that "Comcast's monolithic actions were *not only done in the Northern Division*, particularly in the Regions in which Plaintiffs performed their work, *but in other Divisions* and Regions across the Country.") (emphasis added). Plaintiffs appear to believe that they may define a market by

where *they themselves* operate, even though by their own admission, the same conspiracy has led to the same effect both inside and outside the "Northern Division."

"Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Plaintiffs have failed to propose a market based on interchangeability of cable installation services or cross-elasticity of demand for such services. In particular, the SAC fails to allege whether other cable providers, aside from Comcast, hired cable installation subcontractors in the "Northern Division"; whether Plaintiffs' installation services are interchangeable with their competitors' services in the "Northern Division"; or whether the "Northern Division" incorporates the entirety of the market's limits, beyond which Plaintiffs' services are no longer interchangeable with those of its competitors. Additionally, Plaintiffs' attempt to confine the relevant market to the "Northern Division" is belied by the rest of the allegations in the SAC, which indicate that Plaintiffs regard the whole of the United States as the relevant market. *See* Doc. 71 ¶ 200 ("Defendant Comcast, who led the conspiracy, has substantial market power as the largest purchaser for cable installation in the United States."); *id.* ¶ 225 (same); *id.* ¶ 212 ("Defendant Comcast, which led the conspiracy, has substantial market power as the

20

largest cable company and Internet Service Provider by revenue in the United States as well as the largest purchaser of cable installation services."); *id.* ¶ 237 (same).

Perhaps recognizing the inadequacies of the SAC's market definition, Plaintiffs attempt to bolster their allegations through their brief, arguing that Comcast has significant market power in the Northern Division according to a website called broadbandnow.com. Doc. 90 at 5. Even if the Court may consider new allegations in a party's briefing, the citation fails to offer support for Plaintiffs' contentions. Upon review, the website appears to be a tool to help *individual consumers* to find cable providers like Comcast by geographic location. This citation reveals that Plaintiffs continue to "mistakenly conflate two distinct markets"—the cable and internet service provider industry, where Comcast is a *seller* of cable content and services to individual consumers, and the cable installation industry, where Comcast is a *buyer* of installation services. Doc. 67 at 21.

The Court is baffled by Plaintiff's persistence in conflating the two markets, even after the Court's extensive discussion in its previous opinion. *See id.* at 21-22. Plaintiffs, as cable installation subcontractors, are not aggrieved Comcast customers. Yet they insist on relying upon allegations of dissatisfaction among Comcast consumers as evidence of a conspiracy to lessen competition in the cable *installation* market. *See, e.g.*, Doc. 71 ¶¶ 110-112 (alleging that internet providers perform poorly on the "American customer Satisfaction Index" and that cost of cable consumers increased "nationally."). The problem is only confounded by Plaintiffs' opposition brief, which makes unsubstantiated claims to

investigations by the FCC, Congress, and the Wall Street Journal regarding Comcast's customer dissatisfaction. *See, e.g.,* Doc. 90 at 33 ("Consumers now pay more, the service is awful, people are being charged for services they did not even receive, and consumers are subjected to service calls by overworked, untrained and unqualified technicians. These are not just Plaintiffs' allegations, but also constitute allegations put forth by the FCC, the United States Congress and Senate, the Wall Street Journal, various cable publications from the Internet and other articles cited in this memorandum of law."). Notwithstanding the fact that these claims do not appear anywhere in the SAC, the Court fails to see how regulatory action or news articles concerning customers' dissatisfaction in the *cable provider* market have any bearing on the competition within the *cable installation* market. As the Court previously found, Comcast's role as a seller in the cable provider market is not relevant to its role as a buyer in the installation market. Plaintiffs' continued conflation of the two, either by willfulness or by ignorance, does not warrant any further discussion from this Court. [3]

---

[3] On the whole, Plaintiffs' brief is heavy in rhetoric and low in substance. In place of legal arguments, the brief is filled with hyperbolic rhetorical questions or melodramatic rants. *See, e.g.* Doc. 90 at 35 (asserting that Comcast had a practice of lying to government regulators: "This is Comcast's modus operandi: to run over any company, destroy competition and make misrepresentations, believing that it can get away with anything because Comcast has too much money for anyone to be able to go against it"); *id.* at 4 ("Why else would Comcast keep Decisive and Vitel as subcontractors or business partners when they were both involved in the illegal activities, unless they had some sort of deal going on?"); *id.* at 24 ("The Court should look at the agreement or conspiracy as an ordinary prudent person using common sense. Who would partner with two dishonest companies that stole hundreds of thousands of dollars of equipment, manipulated your performance metrics system, and caused you to be fined by the SEC or report the fraudulent representations or misrepresentations to shareholders? No rational company would partner with companies like this unless there were some sort of illegal agreement.").

Finally, in its previous opinion, the Court noted that Plaintiffs may have been suggesting (though it was not clear from the previous complaint) that Comcast was a monopsony, that is, "[a] firm that has substantial power on the buy side of the market," but cautioned Plaintiffs that without proper allegations of a conspiracy, the mere existence of a monopsony does not constitute an antitrust violation. Doc. 67 at 22 (citing *West Penn*, 627 F.3d at 103). Plaintiffs have taken to use the word at length in their brief, arguing that Comcast engaged in "predatory bidding, as it led Comcast to determine what price it would accept which would be below cost pricing," and that "[t]he other Defendants, the predators, had a strong probability of recouping those losses incurred because Comcast through its monopsony power was able to give Vitel and Decisive all of the work because the competition would be eliminated and not be able to compete." Doc. 90 at 31 (citing *Weyhaeuser Co. v. Ross-Simmons Hardwood Lumber Co. Inc.* 549 U.S. 312, 314 (2007)).

Plaintiffs misunderstand the concept of predatory bidding. There, the focus is on Comcast's attempt to drive out its cable provider competitors. In the context of a monopsony engaging in anticompetitive behavior, a powerful buyer such as Comcast may engage in predatory bidding by initially accepting *higher* prices for the services of Plaintiffs, Decisive, and Vitel, even if it meant that Comcast would have to temporarily bear higher subcontractor costs and perhaps even sell its own end-products at a loss. In the second

---

At best, these dubious "arguments" reveal a deep confusion over the legal basis for Plaintiffs' claims. At worst, they may be a ploy to distract from Plaintiffs' inability to shoulder their burdens of pleading antitrust injury and anticompetitive effects under a rule of reason analysis. In any event, Plaintiffs' counsel would do well to focus their briefing on substantive legal arguments in the future.

stage of predatory bidding, however, Comcast would have driven other buyers out of the cable installation market, leaving it to be the *only* buyer in the market, and therefore be able to force sellers such as Decisive, Vitel, and Plaintiffs to sell their services to Comcast at unreasonably low prices. There are no allegations resembling such a scheme here. Just as Comcast would have no motive in conspiring with Decisive and Vitel to drive up subcontractor rates, Decisive and Vitel would have no motive in conspiring with Comcast to help it engage in predatory bidding. In essence, predatory bidding is a scheme engaged in by a single, powerful buyer to drive other buyers out of the market, not a conspiracy between buyers and sellers to drive other sellers from the market. Plaintiffs' arguments that Comcast engaged in predatory bidding as a monopsony are therefore without merit. As this Court noted in its previous opinion, barring allegations that would substantiate an antitrust action, a monopsony "is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *West Penn*, 627 F.3d at 103.[4] *See also LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 650 (E.D. Pa. 2017) (holding that "Defendants' refusal—whether concerted or not—to purchase any telemetry device—whether produced by [Plaintiff] or not—is not an antitrust violation, but rather a legal exercise of Defendants' monopsony power....The alleged fact that Defendants' decisions have caused [Plaintiff's]

---

[4] Similarly, the SAC also alleges, for the first time, that Comcast had bought up other cable providers "[i]n the very late 1990's...into the early 2000's" and used a restrictive covenant to block a potential sale of Plaintiff "in the early 2000's." Doc. 71 ¶¶ 10, 15. However, the fact that Comcast is a large cable provider company does not, by itself, suggest that it had any reason to engage in a conspiracy to increase cable installation companies' rates. In any event, the remote events from the early 2000's have little bearing on Plaintiffs' termination in 2012.

revenues to drop [ ] dramatically does not render Defendants' behavior illegal under the Sherman Act.") (citing *West Penn*, 627 F.3d at 103).

In sum, the SAC continues to be plagued by Plaintiffs' tunnel vision focus on their own injury without tying their allegations to a conspiracy to harm overall competition. Plaintiffs' plight, which directly arose out of Comcast's decisions favoring Vitel and Decisive over them, may invite sympathy, especially if the allegations of Vitel and Decisive's unsavory business tactics are indeed true. However, these allegations cannot convert Plaintiffs' aggrievement into a Sherman Act claim. Antitrust laws are concerned with market, not any particular players within it. Thus, Plaintiffs' Sherman Act claim must again be dismissed.

Having had three opportunities to adequately plead an antitrust action and the benefit of the Court's guidance on the previous complaint's deficiencies, Plaintiffs have not demonstrated that another opportunity to amend would be able to cure the defects of their antitrust action. *See LifeWatch*, 248 F. Supp. 3d at 651 (granting motion to dismiss antitrust action with prejudice when "[o]ver the past five years, LifeWatch has amended its complaint three separate times—yet it still has not alleged any colorable antitrust violation and would not be able to do so even if the Court granted leave to amend yet again.").

## B. Plaintiffs Failed to Plausibly Allege An Employment Discrimination Claim

Similar to the antitrust claim, the SAC added a few desultory allegations to the employment discrimination claim without curing its fundamental defects. In its previous

opinion, this Court provided extensive guidance on how the claim may be adequately pleaded:

> Plaintiffs do not allege, for example, how many of the original 176 cable installation companies hired by Comcast were minority or Caucasian owned, if there are any "diverse" cable installation companies that are comparable to plaintiffs in size, regions served, or types of services provided, and if there are, whether those comparable "diverse" companies were retained by Comcast. Furthermore, it cannot be said that Vitel is a comparable firm to plaintiffs, as the Amended Complaint repeatedly allege[s] that Vitel is a "larger" firm that enjoys the concomitant advantages in gaining Comcast's business. Thus, plaintiffs have not plausibly alleged that they were passed over in favor of Vitel *because of* their race.... Save for the conclusory allegations that Plaintiffs are "owned and operated by Caucasian people" and that "Vitel was tracked as diverse," plaintiffs have failed to plead that they were treated unfavorably because their owners are Caucasian.

Doc. 67 at 29 (internal citations omitted). The only new allegations in the SAC that may plausibly be read as attempting to conform to the Court's guidance above are that "Plaintiffs performed as well, or better, as Defendant Vitel at installing cable"; that "[u]nlike Vitel, Plaintiffs had not been routinely investigated for misappropriating Comcast property"; and that Plaintiffs "were not chosen over Vitel even though Vitel was the only minority company that had over 100 trucks, and both McLaughlin and Cable Line had 100 trucks." Doc. 71 ¶¶ 181, 195, 196. These new allegations are conclusory and insufficient to raise an inference that Vitel was chosen over Plaintiffs for racially motivated reasons. Similarly to the dismissed Amended Complaint, the SAC does not include any allegations about other, "non-diverse" firms that were terminated by Comcast, or any allegations about other, "diverse" firms that were kept on by Comcast. Instead, Plaintiffs continue to rely solely on a

comparison between Vitel and the Plaintiffs. Such comparisons do not make out a claim for reverse discrimination, especially since elsewhere in the SAC, Plaintiffs maintain that Vitel was selected by Comcast by manipulating performance metrics and underbilling services "to help Comcast improve profit margins and less expenses." Doc. 71 ¶¶ 159-161.

In other words, the SAC itself undermines the discrimination claim by providing alternative reasons for Comcast's choice of Vitel over Plaintiffs. While a plaintiff may put forth inconsistent claims in their pleadings, *see* Fed. R. Civ. P. 8(d), they must still muster sufficient allegations as to *each* claim lodged against a defendant. *See Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008) ("Rule 8 only allows alternative claims to be ple[d] if all of the claims are sufficient on their own."); *Davis v. Abington Mem'l Hosp.*, 2012 WL 3206030, at *6 n. 63 (E.D. Pa. Aug. 7, 2012) (finding that "internal inconsistencies render [Plaintiff's] allegations deficient and prevent the Court from making a [requisite] finding" in an FLSA claim), *aff'd*, 765 F.3d 236 (3d Cir. 2014). As with the antitrust claim, Plaintiffs have failed in their third opportunity to adequately plead an employment discrimination claim; thus, the claim will be dismissed with prejudice.

## C. The Court Declines to Exercise Jurisdiction Over the Pendent Claims

Having determined that Plaintiffs' federal claims must be dismissed, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law claims premised on the same allegations. Doc. 71, Counts II, III, and IV. The decision whether to exercise

supplemental jurisdiction under 28 U.S.C. § 1367(a) is subject to the district court's

discretion. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if ... the district court has

dismissed all claims over which it has original jurisdiction."). "[W]here the claim over which

the district court has original jurisdiction is dismissed before trial, the district court must

decline to decide the pendent state claims unless considerations of judicial economy,

convenience, and fairness to the parties provide an affirmative justification for doing so."

*Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995) (internal citations

omitted). In light of the dismissal of the federal claims, the Court will dismiss Counts II, III,

and IV without prejudice.

### V. Conclusion

For the reasons stated above, as well as the legal principles and analyses espoused

in the Court's previous opinion (Doc. 67), Defendants' motions to dismiss the Second

Amended Complaint (Doc. 71) will be granted. A separate Order shall issue.

Robert D. Mariani
United States District Judge